IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SSC MANAGER, LLC d/b/a SeventySix Capital, a Delaware limited liability company, | : : : | Case No.: 17-cv-1042 |
| Plaintiff, | : : | ANSWER, COUNTERCLAIM |
| v. | : : | AND THIRD PARTY COMPLAINT |
| VENEZIA FC 1907 LP, a Cayman Islands Exempted Limited Liability Partnership; VENEZIA FC 1907 GP, a Cayman Islands corporation; and VENEZIA F.C. S.R.L.D., an Italian corporation, | : : : : : : : | JURY TRIAL DEMANDED |
| Defendants. | : | |
| VENEZIA FC 1907 LP, a Cayman Islands Exempted Limited Liability Partnership, | : : : | |
| Counterclaim Plaintiff, | : : | |
| v. | : : | |
| SSC MANAGER, LLC d/b/a Seventy Six Capital, a Delaware limited liability company, | : : : | |
| Counterclaim Defendant. | : | |
| VENEZIA FC 1907 LP, a Cayman Islands Exempted Limited Liability Partnership, | : : : | |
| Third Party Plaintiff, | : : | |
| v. | : : | |
| WAYNE KIMMEL, RYAN HOWARD and JON POWELL, | : : : | |
| Third Party Defendants. | : | |

## DEFENDANTS' ANSWER TO AMENDED COMPLAINT

Defendants Venezia FC 1907 LP, Venezia FC 1907 GP, and Venezia F.C. S.r.l.d. (collectively the "VFC Parties"), as and for their Answer to the Amended Complaint of SSC Manager, LLC, d/b/a Seventy Six Capital ("SSC"), allege as follows:

1.      The VFC Parties deny the allegations contained in Paragraph 1 of the Amended Complaint except admit that the Amended Complaint purports to be an action for declaratory judgment against defendants Venezia FC 1907 LP ("Venezia LP"), Venezia FC 1907 GP ("Venezia GP"), and Venezia F.C. S.r.l.d. ("Venezia FC"), and that the Amended Complaint seeks a declaration that SSC has no obligation, contractual or otherwise, to invest in Venezia FC, or to otherwise provide any money to the VFC Parties.

2.      The VFC Parties deny the allegations contained in Paragraph 2 of the Amended Complaint.

3.      The VFC Parties deny having sufficient knowledge or information to adequately respond to the allegations contained in Paragraph 3 of the Amended Complaint except admit that in late 2016 and early 2017, SSC advised that it was conducting due diligence with respect to its proposed investment in Venezia LP.

4.      The VFC Parties deny the allegations contained in Paragraph 4 of the Amended Complaint, except admit that SSC requested financial information from the VFC parties as part of its purported due diligence and further admit that after SSC reneged on its promises to invest in one or more of the VFC Parties, the VFC Parties requested a loan from SSC to fund the VFC Parties' immediate operations.

5.      The VFC Parties deny having sufficient knowledge or information to adequately respond to the allegations contained in Paragraph 5 of the Amended Complaint except admit that

they asked for a loan from SSC after SSC reneged on its promises to invest in one or more of the VFC Parties.  The VFC Parties further admit that SSC declined to provide that loan.

6.      The allegations contained in Paragraph 6 of the Amended Complaint purport to refer to a March 1, 2017 email and March 3, 2017 letter that are documents.  To the extent the allegations contained in Paragraph 6 of the Amended Complaint are inconsistent with those documents referred to therein, those allegations are denied.  The VFC Parties further admit that the Amended Complaint purports to seek declarations from this Court that it has no obligation, contractual or otherwise, to invest in Venezia FC or to provide any money to the VFC Parties.

7.      The allegations contained in Paragraph 7 of the Amended Complaint purport to state a legal conclusion for which no response is required.  To the extent a response is required, the allegations contained in Paragraph 7 are denied.

8.      The allegations contained in Paragraph 8 of the Amended Complaint purport to state a legal conclusion for which no response is required.  To the extent a response is required, the allegations contained in Paragraph 8 are denied.

9.      The allegations contained in Paragraph 9 of the Amended Complaint purport to state a legal conclusion for which no response is required.  To the extent a response is required, the allegations contained in Paragraph 9 are denied.

10.     The VFC Parties deny having sufficient knowledge or information to adequately respond to the allegations contained in Paragraph 10 of the Amended Complaint except admit that, upon information and belief, SSC is a Delaware limited liability company that has a principal place of business in Radnor Township, Delaware County, Pennsylvania.

11.     The VFC Parties admit the allegations contained in Paragraph 11 of the Amended Complaint.

12.     The VFC Parties admit the allegations contained in Paragraph 12 of the Amended Complaint and further state that Venezia GP is not (and has not) sought money from SSC. As such, Venezia GP should not be a party to this litigation.

13.     The VFC Parties admit the allegations contained in Paragraph 13 of the Amended Complaint, except that Venezia FC is no longer in Lega Pro, having earned promotion to Serie B, and further state that Venezia FC is not seeking (and has not sought) money from SSC. As such, Venezia FC should not be a party to this litigation.

14.     The VFC Parties admit the allegations contained in Paragraph 14 of the Amended Complaint.

15.     The VFC Parties deny the allegations contained in Paragraph 15 of the Amended Complaint except admit that in October 2016, Tapinis, who was a family friend of Kimmel's, contacted Kimmel about the opportunity to invest in Venezia LP. The VFC Parties deny having sufficient knowledge or information to know where Kimmel was "located" at the time.

16.     The VFC Parties deny the allegations contained in Paragraph 16 of the Amended Complaint except admit that there was a conference call held on November 4, 2016 between Tacopina, Tapinis, Goldman, Kimmel and another representative of SSC wherein the parties discussed a potential investment in Venezia LP at a valuation of $35 million. The VFC Parties further admit that Tapinis then arranged for an in-person meeting to further discuss the potential investment opportunity. The VFC Parties further state that the third through fifth sentences of Paragraph 16 purport to refer to a presentation, which is a document. To the extent the allegations in the third, fourth or fifth sentence of Paragraph 16 of the Amended Complaint are inconsistent with the document referred to therein, those allegations are denied.

17.     The VFC Parties deny having sufficient information and belief to adequately respond to the allegations contained in Paragraph 17 of the Amended Complaint except admit that there was an in-person meeting in November 2016 between SSC and its members and representatives of the VFC Parties at SSC's office in Radnor Township, Pennsylvania.  The VFC Parties further state that Tacopina, Tapinis and Goldman presented their plan to take Venezia from Italy's third tier football league to Serie A, as well as their plans for the construction of a new stadium.  The VFC Parties further state that Tacopina, Tapinis and Goldman also disclosed that they had recently received a $2.5 million equity investment in Venezia LP and other potential investors that were interested in funding Venezia LP.  The remaining allegations in Paragraph 17 are denied.

18.     The VFC Parties admit the allegations contained in Paragraph 18 of the Amended Complaint except deny having sufficient knowledge or information to know where Kimmel was located when he received the financial information provided by Tapinis.

19.     The VFC Parties admit the allegations contained in Paragraph 19 of the Amended Complaint.  The VFC Parties further state that Venezia LP's immediate cash needs and general financial condition were openly discussed at that January 6, 2017 meeting.

20.     The VFC Parties admit the allegations contained in Paragraph 20 of the Amended Complaint.

21.     The VFC Parties deny the allegations contained in Paragraph 21 of the Amended Complaint except admit that "Investor 1" had invested another $1 million in Venezia LP in January 2017 (for a total equity investment of $3.5 million).  The VFC Parties further state that Kimmel was disappointed when he heard that Venezia LP had sold an additional $1 million of equity to someone other than SSC.

22.     The VFC Parties deny the allegations contained in Paragraph 22 of the Amended Complaint.

23.     The VFC Parties deny having sufficient knowledge or information to adequately respond to the allegations contained in Paragraph 23 of the Amended Complaint except admit that Kimmel spoke to "Investor 1". The VFC Parties further state that after the phone call between Kimmel and "Investor 1", "Investor 1" told the VFC Parties that Kimmel and SSC "were in".

24.     The VFC Parties deny the allegations contained in Paragraph 24 of the Amended Complaint except admit hat Kimmel and another representative of SSC traveled to Venice, Italy from January 27 to January 29, 2017. By way of further answer, the circumstances and context of what occurred on that trip to Venice are stated in Venezia LP's Counterclaim and Third Party Complaint, the allegations of which are incorporated herein.

25.     The allegations contained in Paragraph 25 of the Amended Complaint purport to refer to an email that is a document. To the extent the allegations contained in Paragraph 25 of the Amended Complaint are inconsistent with the document referred to therein, those allegations are denied.

26.     The VFC Parties deny the allegations contained in Paragraph 26 of the Amended Complaint, except admit that there was a telephone conference held on January 30, 2017.

27.     The VFC Parties admit the allegations contained in Paragraph 27 of the Amended Complaint.

28.     The VFC Parties deny the allegations contained in Paragraph 28 of the Amended Complaint, except admit that Tapinis and Kimmel spoke on or about February 6, 2017 about the status of SSC's contemplated investment in Venezia LP. The VFC Parties further state that

when Kimmel asked for Venezia's cash flow statements, he noted that the cash flow statements were requested because they were "part of the process" but *not* "part of the decision making" (*i.e.*, the cash flow statements were not material to SSC's investment).

29.     The VFC Parties deny the allegations contained in Paragraph 29 of the Amended Complaint except admit that Tapinis provided Kimmel and SSC with additional financial information on or about February 10, 2017.

30.     The VFC Parties deny the allegations contained in Paragraph 30 of the Amended Complaint except admit that Kimmel requested certain additional information on February 13, 2017.  The VFC Parties further state that Kimmel represented that he wanted this additional information so that he could share it with "friends and family", who may invest in Venezia LP alongside SSC.

31.     The allegations contained in Paragraph 31 of the Amended Complaint purport to refer to an email and attachments that are documents.  To the extent the allegations contained in Paragraph 31 of the Amended Complaint are inconsistent with the documents referred to therein, those allegations are denied.

32.     The allegations contained in Paragraph 32 of the Amended Complaint purport to refer to an email and attachments that are documents.  To the extent the allegations contained in Paragraph 32 of the Amended Complaint are inconsistent with the documents referred to therein, those allegations are denied.

33.     The VFC Parties deny the allegations contained in Paragraph 33 of the Amended Complaint.

34.     The VFC Parties deny the allegations contained in Paragraph 34 of the Amended Complaint except admit that Tapinis provided Kimmel with additional financial information on

February 19, 2017. The VFC Parties further state that the last sentence of Paragraph 34 of the Amended Complaint purports to refer to certain financial information that are contained in documents. To the extent the allegations contained in the last sentence of Paragraph 34 of the Amended Complaint are inconsistent with the documents referred to therein, those allegations are denied.

35.     The allegations contained in Paragraph 35 of the Amended Complaint purport to refer to a February 19, 2017 email, which is a document. To the extent the allegations contained in Paragraph 35 are inconsistent with the February 19, 2017 email, those allegations are denied. By way of further answer, the circumstances and context of SSC's reneging on its agreement to invest in Venezia LP are stated in Venezia LP's Counterclaim and Third Party Complaint, the allegations of which are incorporated herein.

36.     The allegations contained in Paragraph 36 of the Amended Complaint purport to refer to a February 21, 2017 email, which is a document. To the extent the allegations contained in Paragraph 36 are inconsistent with the February 21, 2017 email, those allegations are denied. By way of further answer, the circumstances and context of SSC's reneging on its agreement to invest in Venezia LP are stated in Venezia LP's Counterclaim and Third Party Complaint, the allegations of which are incorporated herein.

37.     The allegations contained in Paragraph 37 of the Amended Complaint purport to refer to a February 21, 2017 email exchange between Kimmel and Tacopina, which is a document. To the extent the allegations contained in Paragraph 37 are inconsistent with the February 21, 2017 email exchange, those allegations are denied. By way of further answer, the circumstances and context of SSC's reneging on its agreement to invest in Venezia LP are stated

in Venezia LP's Counterclaim and Third Party Complaint, the allegations of which are incorporated herein.

38.     The VFC Parties deny the allegations contained in Paragraph 38 of the Amended Complaint except admit that Kimmel, Tacopina, Tapinis and Goldman participated in a teleconference on February 22, 2017, wherein Kimmel stated (among other things) that SSC would not invest in Venezia LP unless it could raise the entirety of the $6.5 million investment. Kimmel conceded that this was a "radical change" from his prior representations that SSC would fund all, or most, of the $6.5 million.  By way of further answer, the circumstances and context of SSC's reneging on its agreement to invest in Venezia LP are stated in Venezia LP's Counterclaim and Third Party Complaint, the allegations of which are incorporated herein.

39.     The VFC Parties deny the allegations contained in Paragraph 39 of the Amended Complaint.

40.     The VFC Parties deny having sufficient knowledge or information to adequately respond to the allegations contained in Paragraph 40 of the Amended Complaint except state that Kimmel and Tapinis spoke on or about February 23, 2017 and Kimmel told Tapinis that SSC was not going to invest in Venezia LP.  By way of further answer, the circumstances and context of SSC's reneging on its agreement to invest in Venezia LP are stated in Venezia LP's Counterclaim and Third Party Complaint, the allegations of which are incorporated herein.

41.     The VFC Parties deny the allegations contained in Paragraph 43 of the Amended Complaint except admit that on February 28, 2017, Tapinis and Tacopina called Kimmel and again asked for a $1 million for Venezia LP.

42.     The VFC Parties deny the allegations contained in Paragraph 42 of the Amended Complaint.

43.    The allegations contained in Paragraph 43 of the Amended Complaint purport to refer to a March 1, 2017 email, which is a document.  To the extent the allegations contained in Paragraph 43 are inconsistent with the March 1, 2017 email, those allegations are denied.  By way of further answer, the circumstances and context of SSC's reneging on its agreement to invest in Venezia LP are stated in Venezia LP's Counterclaim and Third Party Complaint, the allegations of which are incorporated herein.

44.    The allegations contained in Paragraph 44 of the Amended Complaint purport to refer to the March 3rd Letter, which is a document.  To the extent the allegations contained in Paragraph 44 are inconsistent with the March 3rd Letter, those allegations are denied.  By way of further answer, the circumstances and context of SSC's reneging on its agreement to invest in Venezia LP are stated in Venezia LP's Counterclaim and Third Party Complaint, the allegations of which are incorporated herein.

45.    The VFC Parties deny the allegations contained in Paragraph 45 of the Amended Complaint.  By way of further answer, the circumstances and context of SSC's reneging on its agreement to invest in Venezia LP are stated in Venezia LP's Counterclaim and Third Party Complaint, the allegations of which are incorporated herein.

46.    The VFC Parties repeat and reallege their responses to Paragraphs 1 through 45 as if fully set forth herein.

47.    The VFC Parties admit that SSC purports to seek declarations as to the rights and legal relations between SSC and the VFC Parties.  The VFC Parties deny SSC is entitled to any of its requested relief.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

48.     The Amended Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

49.     For the reasons set forth below, SSC is not entitled to the declaration that it seeks because it promised the VFC Parties that it would invest $6.5 million in Venezia LP and the VFC Parties reasonably relied on SSC's promise to their detriment.

### Third Affirmative Defense

50.     For the reasons set forth below, SSC's claim is barred by the doctrine of waiver and/or equitable estoppel.

### Fourth Affirmative Defense

51.     For the reasons set forth below, SSC has unclean hands and is not entitled to any equitable relief.

### Fifth Affirmative Defense

52.     SSC's claim is barred, in whole or in part, by documentary evidence.

### Sixth Affirmative Defense

53.     SSC is not entitled to the requested relief because as set forth in Venezia LP's Counterclaim below, SSC defrauded the VFC Parties into believing it would invest in Venezia LP.

### Seventh Affirmative Defense

54.     The VFC Parties reserve any additional or further defenses as may be revealed by information that may be acquired in discovery or otherwise.

WHEREFORE, the VFC Parties request that judgment be entered in their favor, together with such other relief as this Court deems just and proper.

## COUNTERCLAIM AND THIRD PARTY COMPLAINT

Counterclaim and Third Party Plaintiff, Venezia FC 1907 LP (the "Company"), as and for its Counterclaim and Third Party Complaint, alleges as follows:

### Facts Common to the Counterclaims and Third Party Complaint

55.     This Counterclaim and Third Party Complaint arise out of the fraudulent misconduct of SSC Manager, LLC d/b/a Seventy-Six Capital ("SSC") and its "partners", Wayne Kimmel ("Kimmel"), Jon Powell ("Powell"), and Ryan Howard ("Howard", the former All-Star first baseman for the Philadelphia Phillies), who, in January 2017, promised the Company (albeit falsely) that they would invest $6.5 million in the Company's Series B round of financing. (SSC, Kimmel, Powell, and Howard will hereinafter be referred to as the "SSC Defendants.")

56.     As set forth more fully below, the SSC Defendants promised and represented to the Company on January 29, 2017 (and thereafter) that the SSC Defendants would invest at least $6.5 million in the Company, including by representing that they (i) had sufficient information to make the investment, (ii) were "100%" committed to investing in the Company, (iii) "we're taking the rest of the round" (*i.e.*, by investing the promised $6.5 million, the SSC Defendants would complete what was left in the Series B round), and (iv) had the ability, within SSC, to pay the full $6.5 million.

57.     The SSC Defendants' representations were critical to the Company because, at the time, the Company sought promptly to complete its Series B financing round so that it could meet its financial obligations and continue its march forward on the pitch and on the balance sheet.

58.     The SSC Defendants were well aware of the Company's financial situation and its desire promptly to complete this financing when they made the aforementioned representations and assured the Company of their commitment to fund the entire $6.5 million by February 10,

2017.  The SSC Defendants were certain that they would complete the Series B round – so much so that they instructed the Company to cease all efforts to obtain other potential investors or financing.

59.     The SSC Defendants gave the Company every reason to believe that their representations were, indeed, true.  In fact, the SSC Defendants held themselves out to be good "ethical" businessmen who were committed to doing right by their "partners".  Kimmel even authored a book entitled "Six Degrees of Wayne Kimmel", which a number of Company representatives read as part of their due diligence of the SSC Defendants.  Among other things, Kimmel proclaimed in his book that "in the long run, success comes to those who help others and treat them with respect."

60.     But as it turned out, none of the SSC Defendants' representations was true and Kimmel's claims of being an honest and ethical businessman were likewise false.  For example, while Kimmel had assured the Company in January 2017 that the SSC Defendants possessed all the due diligence material they needed to invest, he and his colleagues later claimed – at the thirteenth hour, when it came time for them to invest – that the SSC Defendants needed more information before they could make good on their promises and invest in the Company.

61.     Similarly, while Kimmel had represented to the Company that the SSC Defendants could and would complete the Series B round themselves, the SSC Defendants (through Kimmel) later claimed that they could not invest a single dollar in the Company until they raised all of the funds from outside investors.

62.     After repeatedly assuring the Company that their investment and funding was forthcoming and instructing the Company not to pursue other investors or financing, the SSC Defendants ultimately withdrew and refused to honor their promise to invest in the Company and

to do so quickly.  In so doing, the SSC Defendants forced the Company to obtain financing from another source on far worse terms than (i) what the SSC Defendants had committed to or (ii) what the Company could have otherwise obtained if not defrauded and limited by the SSC Defendants' conduct.  The Company suffered millions of dollars in damages as a direct result of the SSC Defendants' conduct.

63.     As if all of that were not bad enough, the Company discovered – after the SSC Defendants had reneged on their commitment to invest – that the SSC Defendants had never intended to invest $6.5 million of their own money in the Company anyway.  Rather, the SSC Defendants (especially SSC as a registered investment advisor and Kimmel as its control person) were – *without the Company's knowledge or consent* – marketing the Company's Series B round to their own clients and investors, and the SSC Defendants (i) were seeking a fee from the funds they raised from their clients (such that the more money they raised, the bigger fee they earned), and (ii) were telling their clients and investors that they would only contribute "approximately" $1.5 million of their own money.

64.     Upon information and belief, the SSC Defendants' representations to the Company were part of the SSC Defendants' concerted plan intended to cause the Company to immediately stop seeking alternative funding so that the SSC Defendants could (i) maximize the monies they raised from their investors and clients (and the fees they would collect on those monies), and (ii) attempt to extract more favorable terms on their investment.

65.     The SSC Defendants reneged on their commitment to fund the Company because, upon information and belief, they learned that they would be unable to raise sufficient funds from their clients and investors to earn a substantial fee and make the investment worth their

while.  Accordingly, the Company now seeks monetary damages in an amount to be determined at trial.

## The Parties

66.     The Company is a Cayman Islands Exempted Liability Partnership with its principle place of business in the Cayman Islands.

67.     Upon information and belief, Counterclaim Defendant SSC is a Delaware limited liability company that has a principal place of business in Radnor Township, Delaware County, Pennsylvania.

68.     Upon information and belief, Third Party Defendant Wayne Kimmel is an individual who resides and/or works in Radnor, Pennsylvania.

69.     Upon information and belief, Third Party Defendant Jon Powell is an individual who resides and/or works in Radnor, Pennsylvania.

70.     Upon information and belief, Third Party Defendant Ryan Howard is an individual who resides, works and/or transacts business in Philadelphia, Pennsylvania.  Howard recently became a partner in SSC.

## Venue and Jurisdiction

71.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs and is between diverse parties.

72.     This Court has personal jurisdiction over the SSC Defendants because they reside and/or work in this jurisdiction and/or have availed themselves of the jurisdiction of this Court by transacting business in this jurisdiction.

73.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(1) and (2). SSC commenced this action in this venue asserting that "a substantial part of the events or

omissions giving rise to the claim occurred in this judicial district". The Company's counterclaim is a compulsory counterclaim under Fed. R. Civ. P. 13(a)(1) and thus, must be asserted in this action.

## Background

74.    In October of 2016, the Company began looking to raise $10 million through its Series B round of financing.

75.    The Series B financing initially valued the Company at $35 million and ultimately at $30 million (post investment). Thus, the Series B investors would collectively own at least 33% of the Company.

76.    In the course of meeting potential investors, the Company was introduced to SSC and its managing partner, Kimmel. At the time, Kimmel was a long-time family friend of John Tapinis ("Tapinis"), who is a member of the Venezia FC Board of Directors.

77.    The parties first met on November 22, 2016 at SSC's offices in Radnor, Pennsylvania. Present at the meeting were Kimmel, Powell, Howard, and Chad Stender ("Stender") from SSC and Tapinis (who had arranged the meeting), Joe Tacopina, and John Goldman from the Company. The meeting – which lasted several hours and included watching the team win a very exciting Coppa Italia match (on penalty kicks) over Mike Piazza's Reggiana team – was by all accounts positive. There appeared for sure to be a strong possibility that Kimmel, Powell, and Howard would invest. Indeed, on repeated occasions after the initial meeting, including in Venice on the night of January 29th, when Kimmel 100% committed the SSC Defendants to the $6.5 million investment, Kimmel told the Company (especially Tapinis) how excited Howard was to make this investment. After the November 22nd meeting, the SSC Defendants began conducting their due diligence of the Company.

78.     In December 2016, the Company provided the SSC Defendants with various documents so that the SSC Defendants could continue their due diligence.

79.     Throughout the due diligence period, the SSC Defendants were enthusiastic about the opportunity to invest in the Company.  As just one example, in January 2017, Kimmel told Tapinis that he was "disappointed" by the fact that the Company had already sold $1 million worth of the Series B shares to someone else.

80.     Upon information and belief, and as set forth more fully below, Kimmel was "disappointed" because he and the other SSC Defendants were not truly investing in the Company but instead were looking for an opportunity to raise money and charge a fee to the investors from whom they raised money.  Thus, from the SSC Defendants' perspective, the sale of $1 million of Series B shares meant that there was now less money for them to raise and less of a fee for them to earn.

81.     On January 6, 2017, the parties met again, this time in New York City.  Present were Kimmel, Stender, Tacopina, Tapinis, and Goldman.  Again, the meeting was extremely positive, and the parties discussed meeting again in Venice later in January so that Kimmel (and whoever else from his side) could attend a game and feel the passion around the project in Venice.  Notably, the Company told the SSC Defendants at this January 6th meeting that the Company needed cash to continue running its operations.  Kimmel and Stender each acknowledged the Company's cash position and said "we understand – let's go to Venice!"

## The SSC Defendants' Trip to Venice

82.     After weeks of due diligence, several meetings and many phone calls, the SSC Defendants traveled to Venice, Italy, to further investigate the merits of their potential investment.

- 17 -

83.    Kimmel and Stender arrived in Venice on January 27th and left on January 30th. During these three days, they toured the team's offices and practice facility, attended the most important game the team has played in more than a decade (a 2-2 draw with Parma) and met with Tacopina, Goldman, Tapinis, and others to talk about the team and the investment.

84.    After all of that, Kimmel and Stender went to dinner with Tapinis, Tacopina, Goldman, and Ted Philipakos, Venezia FC's CEO, on the night of January 29th.

85.    During that dinner, Kimmel represented to the Company that the SSC Defendants would promptly invest at least $6.5 million in the Company.  Among other things, Kimmel represented that "we're in, absolutely, 100%".  Specifically, Kimmel told the Company that the SSC Defendants were going to "take down the rest of the round" (*i.e.*, the remaining $6.5 million) and that the SSC Defendants had the ability – internally – to invest $6.5 million without raising any money from third parties.  Kimmel further assured the Company that the SSC Defendants would fund by February 10, 2017, after they had returned from the Super Bowl.

86.    After dinner, Kimmel, Tacopina, Goldman and Tapinis walked to Piazza St. Marco, where Kimmel called his partners, Powell and Howard, on FaceTime to tell them that he had committed SSC to "tak[ing] down the rest of the round".  Neither Powell nor Howard expressed any reservation about SSC investing $6.5 million in Venezia LP (or even suggested that SSC's commitment should be subject to any further due diligence).  To the contrary, Powell and Howard were ecstatic about investing in Venezia LP and could hardly wait to be part of the Venezia brand.

87.    Kimmel's representation that the SSC Defendants were able to complete the Series B round themselves (that is, without the help from any outside investors) by February 10th (and Powell and Howard's enthusiasm about that commitment) was critical to the Company

- 18 -

because the Company was counting on immediate capital to meet its financial obligations and could not wait for the SSC Defendants (or anyone else for that matter) to first raise capital from third parties, all of which the SSC Defendants (particularly Kimmel) specifically knew.

88.     Of course, it was reasonable to assume that the SSC Defendants were capable of funding the full $6.5 million because (i) Howard – the former Phillies first baseman and Major League Baseball MVP – had himself earned more than $150 million, and (ii) Kimmel claimed on SSC's website to have "invested in over 40 startup technology and healthcare companies, including SeamlessWeb (now public as GrubHub), Take Care Health Systems and NutriSystem." (https://www.seventysixcapital.com/wayne-kimmel/).  Moreover, Kimmel boasted that "[a]mong the Fortune 500 companies that have acquired his portfolio companies are Aramark, Intel, IBM, Walgreens and Yahoo!"  (*Id.*)

89.     To confirm that the SSC Defendants were capable of funding by February 10th, the Company's representatives repeatedly asked Kimmel whether there was any additional information that he or his colleagues would need to complete their due diligence.  Kimmel responded that there was "none".

90.     After committing that the SSC Defendants were capable of funding by February 10th, Kimmel also insisted that the Company cease all other efforts to obtain other Series B investors or otherwise seek alternative financing.

91.     At various times before and after February 10, 2017, Kimmel repeated his promise to "take down" the Series B round and told Tapinis (and, by extension, the Company) that the Company should not communicate with other potential investors about the Series B round or any other sources of financing.

92.     The Company had no reason to doubt the *bona fides* in Kimmel's representations given (i) his long-standing relationship with Tapinis, (ii) the manner in which Kimmel brands himself (to wit, Kimmel's colleagues describe Kimmel on his website as "ethical" and interested in "Tikkun Olam"), and (iii) Kimmel's own claims of being a "man of his word".

93.     Accordingly, the Company acquiesced to Kimmel's demands and ceased its efforts to pursue other potential investors and/or financing.

**After Returning to the United States, the SSC Defendants Renege on Their Promises**

94.     After the January 29th dinner in Venice, the SSC Defendants continued to assure the Company (both directly and indirectly) that they were committed to investing and completing the Company's Series B round.

95.     For example, in addition to Kimmel's representations to Tapinis, Kimmel sent the Company's representatives an email on February 1, 2017, telling them that he was headed to Houston for the Super Bowl where he was going to have "a number of meetings that will be helpful to [the Company]."

96.     Six days later (*i.e.*, on February 7, 2017), Tapinis spoke with Kimmel about the SSC Defendants' investment in the Company and Kimmel confirmed the SSC Defendants' commitment to completing the Series B round.

97.     During that conversation, Tapinis asked Kimmel whether the SSC Defendants could fund in tranches because, as Kimmel already knew, the Company needed capital to satisfy some immediate obligations.

98.     Kimmel absolutely understood the Company's needs and represented to Tapinis that the SSC Defendants would fund $1 million by the following week.

99.     Contrary to Kimmel's representation, the SSC Defendants did not fund the $1 million "by the following week" (or any time thereafter).

100.    Rather, in or about mid-February 2017, the SSC Defendants told the Company that they were no longer going to invest the full $6.5 million by themselves. Instead, they intended to invite "friends and family" to invest alongside them such that the SSC Defendants would now invest $3.5 million of their own money and their friends and family could invest up to $3 million.

101.    The SSC Defendants assured the Company that this change was immaterial because they (i) could fund the entire $6.5 million, even if they did not raise a penny from friends and family, and (ii) would fund their $3.5 million before raising the $3 million from friends and family (so the Company could meet its immediate financial obligations).

102.    Such assurances were even more critical to the Company now because the clock had continued to tick since January, and the Company had been anticipating, based on Kimmel's representations, that the SSC Defendants would fund by February 10, 2017 (as Kimmel had initially promised).

103.    Shortly thereafter, the SSC Defendants changed the terms of their investment again. This time, Kimmel told Tapinis that the SSC Defendants would now be investing only $3 million (not $3.5 million) so that their friends and family could invest up to $3.5 million.

104.    But like before, the SSC Defendants assured the Company that they were still committed to investing in, and completing, the Series B round and that they could fund the entire $6.5 million if they were unable to raise any money from friends and family.

105.    In addition, Kimmel assured Tapinis that the SSC Defendants had $1 million "ready to go" to assist the Company meet its immediate financial needs.

106.    On or about February 16, 2017, the Company sent Kimmel the investment documents for their Series B investment in order to move the process along.  The SSC Defendants never objected to the form of the Company's investment documents or otherwise sought revisions.

107.    On that same day, a Company representative reached out to Kimmel to make sure that the SSC Defendants' contemplated investment was still on track and to request (again) that the SSC Defendants wire the first $1 million so that the Company could meet its immediate financial obligations.

108.    During that teleconference, Kimmel claimed – for the very first time and in direct contravention of his prior representations – that he needed additional financial information from the Company before he could invest even a single dollar.  Kimmel's claim stood in stark contrast to his claim on (i) January 29th when he told the Company's representatives at a dinner in Venice that the SSC Defendants had everything they needed to complete the Series B round, and (ii) February 7, 2017, when Kimmel promised that the SSC Defendants would invest $1 million "next week".

109.    After learning of the SSC Defendants' new requests, the Company's President, Tacopina, sent an email to Kimmel dated February 19, 2017, and noted, among other things, that at the dinner in Venice, Kimmel stated that "[his] group would be coming in for the $6.5 million remainder of the Series B round and that [he] expected to be ready to fund by 2/10."  Tacopina further stated:  "It was my understanding that you had all the information you needed."

110.    Kimmel did not deny that (i) the SSC Defendants would be "coming in for the $6.5 million," (ii) the SSC Defendants would be "ready to fund by 2/10", or that (iii) Kimmel himself had represented that he had all the information needed to make the investment.

- 22 -

111.    On the following afternoon (*i.e.*, February 20, 2017), Kimmel told the Company that Howard had "shared the opportunity to invest with Jimmy Rollins" and that Kimmel would be having a call with Rollins and his adviser on Thursday (*i.e.,* February 23, 2017) about the investment opportunity.

112.    On February 21, 2017, Tacopina sent another email to Kimmel noting that the Company "needs the money urgently at this point" including because "we had anticipated that your investment (or at least $1 million of it) would be received by 2/10."

113.    Tacopina further noted that "[w]e did not pursue other potential sources of capital because you told us in Venice (on 1/29) that your group was definitely in for the remaining $6.5 million and that you expected [the Company] to receive the money by 2/10."

114.    Tacopina also reiterated the Company's previous requests that the SSC Defendants invest the first tranche of $1 million, which Kimmel had claimed SSC had and was ready to invest immediately so that the Company could meet its financial obligations (which, by then, were overdue).

115.    In response to Tacopina's February 21st email, Kimmel again did not deny that he had represented to the Company that his "group was definitely in for the remaining $6.5 million" or that he had represented to the Company that the SSC Defendants expected the Company "to receive the money by 2/10."

116.    Rather, Kimmel simply stated that the SSC Defendants needed "an updated cash flow statement."

117.    Kimmel's request for up-to-the-minute financials was odd because the SSC Defendants already had the Company's financials through December 31, 2016 and the Company's projected cash flows through 2017.  Moreover, this was the first time that Kimmel

(or any of the SSC Defendants) had ever asked for financial information beyond December 31, 2016.

118.     Finally, Kimmel's request for up-to-date financial information is contrary to what he had represented at the dinner in Venice on January 29th (where he said that the SSC Defendants had all the information they needed to invest) or at any time previously.

119.     Upon information and belief, Kimmel's request for information, including updated cash flow, was mere pretext that was designed to delay the Company from seeking alternative financing while the SSC Defendants continued to try to raise money (and earn the fees they were surreptitiously seeking from investors).

120.     On the evening of February 22, 2017, Kimmel and certain Company representatives (including Tapinis and Tacopina) held a teleconference to discuss the SSC Defendants' latest position and their now overdue investment in the Company.

121.     During the February 22nd teleconference, Kimmel sought to change the terms of the SSC Defendants' investment yet again and told the Company – for the first time – that the SSC Defendants would not invest anything until they were sure they could raise the full $6.5 million.

122.     Kimmel also told the Company (for the first time) that it would be difficult to "find" $1 million to invest in the Company quickly (even though Kimmel had previously represented that he had $1 million "ready to go" by the week of February 13th).

123.     Kimmel conceded during the February 22nd teleconference that these latest changes (and, in particular, the SSC Defendants' refusal to fund even a single dollar until they raised the full $6.5 million from third parties) was a "radical" change from what the SSC Defendants had previously represented to date.

124.    On February 23, 2017, Kimmel completely pulled the rug out from under the Company, sheepishly advising that the SSC Defendants, contrary to their prior representations and assurances, would not be investing in the Company under any circumstances and regardless of the consequences.

### The Company Is Forced to Find Alternative, More Expensive Financing

125.    By failing to timely complete their investment in the Company (or even fund the first tranche of $1 million), the SSC Defendants caused severe stress to the Company's financial condition.

126.    Still, the SSC Defendants continued to assure the Company that they were going to invest up through February 22, 2017.  By the time the SSC Defendants finally reneged on their promises, the Company was in critical financial condition and was desperate to find alternative financing to shore up its immediate capital requirements.

127.    Ultimately, the Company found a replacement investor (the "Replacement Investor").  Given the Company's financial situation (which was caused by the SSC Defendants' duplicitous conduct), the Replacement Investor insisted upon more favorable terms than what had been offered other Series B investors (including the SSC Defendants).

128.    Specifically, the Replacement Investor demanded that his $4 million investment be structured as a loan (bearing an interest rate of 15%) and further demanded that the Company's shares that had been set aside for the SSC Defendants (that is, approximately 22% of the common stock) now be conveyed to him instead.

129.    In other words, the Company was compelled to deliver to the Replacement Investor the same equity interest that the SSC Defendants had promised to pay $6.5 million for. But the Company did not receive $6.5 million.  Thus, the Company is now out $6.5 million *and*

it is obligated to repay the $4.4 million (*i.e.*, the principal $4 million plus $400,000 in interest) by November 8, 2017.

130.  Put simply, the financing that the Company was forced to accept as a result of the SSC Defendants' misconduct was far worse than what the SSC Defendants' commitments to fund had been and what the Company could have otherwise obtained if not defrauded, resulting in millions of dollars in damages to the Company.

131.  But the Company had no alternative (as the SSC Defendants knew) because (i) the Company needed a capital infusion to meet its outstanding financial obligations, and (ii) the Company, at the SSC Defendants' insistence, had ceased efforts to obtain alternative financing (because it reasonably believed the SSC Defendants' representations and in the *bona fides* of the SSC Defendants' commitments to fund).

### The Company Discovers the SSC Defendants' Fraudulent Conduct

132.  Soon after Kimmel told the Company that the SSC Defendants would not be investing in the Company, the Company discovered that the SSC Defendants had never intended to pay the full $6.5 million themselves (or even $3.5 million or $3 million) as they had previously and repeatedly represented and promised.

133.  Instead, the Company learned that the SSC Defendants (particularly SSC, a registered investment advisor) had been marketing the Series B round to third parties – not just to friends and family, as they had told the Company – and were seeking to raise $10 million (not just $6.5 million) from their investors and clients.

134.  In the marketing materials distributed by SSC – *without the Company's knowledge or authorization* – SSC (particularly Kimmel) represented to these third parties that SSC would be (i) investing "approximately 15%" of the total invested capital (or approximately $1.5 million, which was approximately 50% (or less) of what the SSC Defendants were

- 26 -

promising the Company they would invest), (ii) charging a fee based on the capital raised from investors, and (iii) serving as "an advisor to the President" of the Company (which was a blatant misrepresentation). SSC also (again without the Company's knowledge or authorization) suggested that the investment it was offering – as a registered investment advisor – to third parties would be "comparable to Real Madrid," which has an enterprise value of $3.6 billion. Obviously, that statement was false and even the suggestion/representation that it was accurate was misleading to potential investors (and improper given Kimmel's status as a registered investment advisor).

135.    The SSC Defendants never told the Company that they were (i) marketing the investment opportunity as a registered investment advisor to third parties (beyond friends and family), (ii) seeking to raise more than $6.5 million from third parties, (iii) charging a fee on the monies that they raised (which would incentivize them to raise more money and commit less of their own capital), or (iv) telling investors that they were going to be an "advisor to the President" (which the Company never suggested or agreed the SSC Defendants could do).

136.    Had the SSC Defendants ever revealed that they were unable to fund the entire $6.5 million and were instead trying to raise the entire $6.5 million from third parties beyond "friends and family", the Company would not have relied on the SSC Defendants' representations and promises and would have instead continued to speak with Series B investors and pursue the two potential investors that had been proposed to the Company (but that the Company did not pursue at the insistence of the SSC Defendants).

137.    Upon information and belief, the SSC Defendants concealed their fund-raising activities – and misrepresented their true intentions – because they had always intended on trying to raise the money from third parties (beyond friends and family) and understood that the larger

the investment opportunity that existed at the Company, the more fees they could earn from their own investors.

138.   Upon further information and belief, the SSC Defendants also knew that if they revealed their true intentions, the Company would have immediately sought funding from other parties, which, in turn, could minimize the potential investment opportunity for which the SSC Defendants could earn a fee.

139.   Had the SSC Defendants disclosed their true intentions, the Company would have pursued and obtained other investors or financing on more favorable terms than it was ultimately forced to accept.

140.   As a direct result of the SSC Defendants' conduct, the Company suffered harm.

## FIRST COUNTERCLAIM & FIRST CAUSE OF ACTION
### (FRAUD)
### (As against SSC and Third Party Defendant Kimmel)

141.   The Company repeats and realleges the allegations contained in Paragraphs 55 through 140 as if fully set forth herein.

142.   As set forth above, SSC and Kimmel repeatedly represented to the Company that, *inter alia*, they (i) were committed to funding the remainder of the Series B round (*i.e.*, $6.5 million), (ii) had the ability to fund the full remaining amount of the Series B round without raising any funds from investors or third parties, (iii) would fund by February 10, 2017, and (iv) would fund the initial tranche of $1 million the week of February 13, 2017.

143.   SSC and Kimmel knew that their representations and omissions were material to the Company in its pursuit to raise money.  Upon information and belief, SSC and Kimmel intended the Company to rely on their false representations and the Company justifiably relied upon those representations.

144.    SSC's and Kimmel's representations were false and misleading when made because neither SSC nor Kimmel ever intended to fund (i) the full $6.5 million without raising funds from outside parties, (ii) the first tranche of $1 million, and/or (iii) by any of the dates promised.

145.    In fact, while SSC and Kimmel were making the aforementioned representations to the Company, they were simultaneously seeking to raise $10 million from their own investors and clients (all without the Company's knowledge or consent).

146.    In the marketing materials that SSC and Kimmel provided their investors and clients, SSC and Kimmel represented that they were (i) investing "approximately 15%" of the total invested capital (or approximately $1.5 million, which was approximately 50% (or less) of what they were telling the Company they would invest), (ii) charging a fee based on the capital they raised from their investors, and (iii) serving as "an advisor to the President" of the Company (which was materially false).

147.    As a result of SSC's and Kimmel's fraud, the Company has been damaged in an amount to be proven at trial.

148.    Because SSC and Kimmel committed their actions knowingly, and in wanton and reckless disregard of the Company's rights, the Company is entitled to recover punitive damages in an amount to be determined at trial.

### SECOND COUNTERCLAIM & SECOND CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION)
### (As against SSC and Third Party Defendant Kimmel)

149.    The Company repeats and realleges the allegations contained in Paragraphs 55 through 148 as if fully set forth herein.

150.    As set forth above, SSC and Kimmel made a misrepresentation of material fact when they represented to the Company that they (i) were committed to funding the remainder of the Series B round (*i.e.,* $6.5 million), (ii) had the ability to fund the full remaining amount of the Series B round without raising any funds from investors or third parties, (iii) would fund by February 10, 2017, and (iv) would fund the initial tranche of $1 million the week of February 13, 2017.

151.    SSC and Kimmel should have known that the their representations were false and misleading when made because neither SSC nor Kimmel ever intended to fund (i) the full $6.5 million without raising funds from outside parties, (ii) the first tranche of $1 million, and/or (iii) by any of the dates promised.

152.    Upon information and belief, SSC and Kimmel made the aforementioned misrepresentations with the intent that the Company would rely on them in order to induce the Company to cease its fund raising efforts and to maximize SSC's opportunity to raise money from third parties and charge a fee for that money.

153.    In fact, while SSC and Kimmel were making the aforementioned representations to the Company, they (along with Powell and Howard) were simultaneously seeking to raise $10 million from their own investors and clients (all without the Company's knowledge or consent).

154.    SSC and Kimmel knew that their representations and omissions were material to the Company in its pursuit to raise money.  And the Company justifiably relied upon SSC's and Kimmel's representations (by, among other things, ceasing its search for other potential Series B investors).

155.    As a result of SSC's and Kimmel's fraud, the Company has been damaged in an amount to be proven at trial.

## THIRD COUNTERCLAIM & THIRD CAUSE OF ACTION

### (PROMISSORY ESTOPPEL)
### (As Against SSC and Third Party Defendant Kimmel)

156.   The Company repeats and realleges the allegations in Paragraphs 55 and 155 as if fully set forth herein.

157.   SSC and Kimmel promised the Company it would fund what was left of the Series B round (*i.e.,* $6.5 million) and insisted that the Company stop seeking funding from other parties.

158.   Given Kimmel's relationship with Tapinis, the representations he made in his book about his business principals, his repeated representations to the Company about his willingness to fund immediately, and his purported ability to immediately fund, the Company reasonably relied on SSC's and Kimmel's promises to fund what was left of the Series B round.

159.   The Company's reliance was to its detriment because, among other things, it prejudicially changed its position by ceasing to pursue other sources of investment (as Kimmel had insisted).

160.   Had the Company not relied on SSC's and Kimmel's representations, it would have obtained investors or financing on more favorable terms than it was ultimately forced to accept.

161.   Of course, once SSC abruptly reneged on its promise to invest, the Company was forced to seek alternative emergency funding, albeit on worse terms, from the Replacement Investor.

162.   As a result of SSC's and Kimmel's actions, Defendants have been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
## AIDING AND ABETTING FRAUD
### (Against Third Party Defendants Powell and Howard)

163.   The Company repeats and realleges the allegations in Paragraphs 55 and 162 as if fully set forth herein.

164.   As set forth above, SSC and Kimmel defrauded the Company by knowingly making misrepresentations that were intended to cause, and did cause, the Company to rely on to its detriment.

165.   Upon information and belief, Powell and Howard had knowledge of SSC's and Kimmel's fraud and substantially assisted them in committing such fraud by leading the Company to believe that SSC (and they as individuals) would invest the remainder of the Series B round (*i.e.,* $6.5 million by February 10, 2017).

166.   Upon information and belief, Howard was a major investor in SSC and took an active role in SSC's investments.  Today, Howard is a partner in SSC (as is Powell).

167.   Indeed, in their conversations with the Company, SSC and Kimmel used (i) Howard, who had a highly publicized five-year $125 million contract with the Philadelphia Phillies, and (ii) Powell to mislead the Company to believe that SSC had the financial capacity to invest $6.5 million by itself by February 10, 2017.

168.   Contributing to that fiction, Howard and Powell were present at the initial meeting in November and participated in a video conference with the Company immediately after the January 29 dinner where Kimmel had promised the $6.5 million investment, in which each individually told the Company how excited he was to be making the investment and joining the Venezia Football Club team.  Howard even asked the Company if he could present the opportunity to his former teammate Jimmy Rollins.

169.     Upon information and belief, at the time that Howard and Powell spoke with the Company, they were aware that SSC would not invest its own money into the Company by February 10, 2017, and was instead attempting to raise outside money, including by distributing marketing materials distributed to the public that contained blatant misrepresentations.

170.     By serving as the face of, and providing substantial assistance with, SSC's and Kimmel's fraud on the Company, Howard and Powell caused the Company to suffer damages in an amount to be proven at trial.

171.     As a result of Powell's and Howard's actions, Defendants have been damaged in an amount to be determined at trial.

172.     Because Howard and Powell committed their actions knowingly, and in wanton and reckless disregard of the Company's rights, the Company is entitled to recover punitive damages in an amount to be determined at trial.

**WHEREFORE**, the VFC Parties respectfully pray for relief and judgment as follows:

(a) Entry of judgment in favor of the VFC parties on SSC's Amended Complaint;

(b) Awarding Venezia LP compensatory damages for all damages sustained as a result of any of the SSC Defendants' wrongdoing, in an amount to be proven at trial (including punitive damages), including interest thereon;

(c) Awarding the VFC Parties such other and further relief as the Court may deem just and proper under the circumstances.

Dated: Philadelphia, Pennsylvania
      May 15, 2017

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER


By:   /s/ Robert L. Ebby
     Robert L. Ebby
     One Logan Square – 27th Floor
     Philadelphia, PA 19103-6933
     215-496-7053
     rebby@hangley.com

FEUERSTEIN KULICK LLP


By: /s/ David Feuerstein
     David Feuerstein, Esq.
     205 E. 42nd Street, 20th Floor
     New York, New York 10017
     646-768-0591
     david@dfmklaw.com

*Attorneys for Defendants and Counterclaim and Third Party Plaintiff Venezia FC 1907 LP*

## CERTIFICATE OF SERVICE

I, Robert L. Ebby, hereby certify that on May 15, 2017, I caused a a true and correct copy

of the foregoing Answer and Counterclaim to be served via email upon the following:

Harvey Bartle, IV
Marc Sonnefeld
Karl Schweiter
MORGAN, LEWIS & BOCKIUP LLP
1701 Market Street
Philadelphia, PA 19103-2921
harvey.bartle@morganlewis.com
marc.sonnenfeld@morganlewis.com
karl.schweitzer@morganlewis.com

*Attorneys for Plaintiff*

Dated:  May 15, 2017

Robert L. Ebby